******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CHARLES CARROLL *v.* GEORGE B. YANKWITT
(AC 39693)
(AC 42730)

Prescott, Elgo and Moll, Js.

*Syllabus*

The plaintiff sought to recover the security deposit he paid to the defendant, his former landlord, in connection with the second of two residential leases that the parties had executed. The first lease was for approximately twelve months and had an open-ended commencement date that began on the date the plaintiff commenced occupancy. The parties thereafter executed the second lease, which also ran for one year, and, under which, the plaintiff tendered the payment of the security deposit to the defendant pursuant to statute ([Rev. to 2013] § 47a-21 (d) (2)). On the day the plaintiff's tenancy concluded under the second lease, the defendant sent him an e-mail informing him of various items of damage to the property and inquiring whether he would repair the damage. When the plaintiff did not respond, the defendant sent him a second e-mail two weeks later, itemizing the damages and stating that he had incurred remediation costs, a loss of rent as a result of his inability to relet the property because of the damage, and that the plaintiff owed him unpaid rent for the final week of the first lease. The plaintiff then sent the defendant a letter by certified mail, return receipt requested, seeking the return of the security deposit. The postal service returned the letter to the plaintiff with a notation that it was unclaimed and unable to be forwarded. In addition to the return of the security deposit, the plaintiff sought double damages pursuant to § 47a-21 (d) (2), and attorney's fees, costs and punitive damages as a result of the defendant's alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendant filed a counterclaim seeking damages for the remediation costs he incurred. The case was tried to an attorney trial referee, who recommended judgment for the plaintiff as to the security deposit, double damages and CUTPA claims, and for the defendant on his counterclaim in part. The trial court adopted the referee's recommendations and rendered judgment accordingly. The court thereafter granted in part the plaintiff's motion for attorney's fees but did not rule on his request for punitive damages. On the defendant's appeal and the plaintiff's cross appeal to this court, *held*:

1. The attorney trial referee improperly recommended, and the trial court wrongly awarded, double damages to the plaintiff, as the defendant's second e-mail complied with the requirements of § 47a-21 (d) (2) by sufficiently apprising the plaintiff of the items of damage that allegedly were caused by his failure to comply with his obligations as a tenant and which exceeded the amount of the security deposit; the referee improperly imposed additional requirements on the defendant that were not set forth in § 47a-21 (d) (2), and, because the amount of the damages alleged in the defendant's e-mail exceeded the amount of the security deposit and interest, the defendant was not required by § 47a-21 (d) (2) to include an explicit statement that no balance of the security deposit remained.

2. The trial court improperly rendered judgment in favor of the plaintiff on the count of his complaint alleging a violation of CUTPA:
   a. The attorney trial referee improperly concluded that the defendant violated CUTPA on the ground that the defendant's written statement of damages failed to satisfy the requirements of § 47a-21 (d) (2): although the plaintiff's counsel and the referee acknowledged at trial that the plaintiff's sole theory of recovery under CUTPA was that the defendant's failure to comply with § 47a-21 (d) (2) constituted a per se violation of CUTPA, the referee went beyond that theory in concluding that the defendant provided an inadequate written statement of damages, as the plaintiff, in his pleadings, did not challenge the adequacy of the defendant's written statement of damages; moreover, the plaintiff could not prevail on either theory of recovery, this court having previously

rejected a claim that a landlord's failure to comply with § 47a-21 (d) (2) is a per se violation of CUTPA when the landlord had complied with the requirements of § 47a-21 (d) (2).

b. The trial court improperly determined that the defendant violated CUTPA on the ground that his statement of damages was pretextual, the court having inaccurately recited in its articulation the attorney trial referee's determination as to damages and disregarded its obligation to accept the referee's findings, which were supported by evidence adduced at trial; the referee did not find, nor did the plaintiff allege, that the damages were pretextual but, rather, found that the defendant had proven several of the damages he claimed and did not meet his burden of proof as to others, which the referee did not find were pretextual or fabricated, and, contrary to the court's articulation, the referee did not find that the damages the defendant claimed were either not suffered by the defendant or proven at trial to be obligations of the plaintiff.

3. The trial court properly accepted the attorney trial referee's findings that the defendant was not entitled to damages on the third and fifth counts of his counterclaim:

a. The referee's finding that there was no evidence that the plaintiff was aware of the accumulation or cause of mud in the crawl space of the property was not clearly erroneous; the defendant failed to prove that the condition occurred after the plaintiff took possession of the property or that there was any nexus between the plaintiff's conduct and the accretion of the mud or water, and the referee was free to reject the defendant's claim that the crawl space was immaculate at the time the plaintiff's tenancy commenced and to credit the plaintiff's testimony that he did not allow water or mud to accumulate in the crawl space.

b. The defendant could not prevail on his claim that the trial court improperly adopted the attorney trial referee's finding that he was not entitled to damages for one week of unpaid rent under the first lease as alleged in the fifth count of his counterclaim: the referee properly had rejected the defendant's claim that some amount of pro rata rent was due for the week at issue, as the first lease, which had an open-ended commencement date, neither indicated nor implied an agreement for pro rata rent; moreover, the first lease expressly contemplated the apportionment of monthly rent to the number of days the plaintiff occupied the property, and, although the parties knew how to add a pro rata payment obligation in the lease, they declined to do so with respect to the open-ended commencement date.

4. There was no basis for the plaintiff's claim on cross appeal that the trial court improperly failed to award him the full amount of his attorney's fee request, this court having concluded that the trial court improperly rendered judgment in his favor on the CUTPA count of his complaint, and, because there was no CUTPA violation, this court declined to address his challenge to the trial court's failure to rule on his request for punitive damages.

Argued September 21, 2020—officially released March 30, 2021

*Procedural History*

Action for, inter alia, the return of a security deposit, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, Housing Session at Norwalk, where the defendant filed a counterclaim; thereafter, the case was referred to *Joseph DaSilva, Jr.*, attorney trial referee, who filed a report recommending judgment in part for the plaintiff on the complaint and for the defendant in part on the counterclaim; subsequently, the court, *Rodriguez, J.*, rendered judgment in accordance with the attorney trial referee's report, from which the defendant appealed to this court; thereafter, this court dismissed the appeal in part; subsequently, the court, *Rodriguez, J.*, granted in part the plaintiff's motion for attorney's fees, and the defendant filed an amended appeal and the plaintiff cross appealed to this court; thereafter, this court consolidated the appeals. *Judgment in AC 39693 reversed in part; further pro-*

*ceedings*; *appeal in AC 42730 vacated.*

*Thomas J. O'Neill*, with whom were *Jennifer L. Shukla*, and, on the brief, *Bryan J. Orticelli*, for the appellant in Docket No. AC 39693 and cross appellee in Docket No. AC 42730 (defendant).

*Brenden P. Leydon*, with whom, on the brief, was *Mark Sank*, for the appellee in Docket No. AC 39693 and cross appellant in Docket No. AC 42730 (plaintiff).

*Opinion*

ELGO, J. In this landlord-tenant dispute, the defendant, George B. Yankwitt, appeals from the judgment of the trial court, rendered following a trial before an attorney trial referee, in favor of the plaintiff, Charles Carroll. On appeal, the defendant claims that the court improperly concluded that (1) he violated General Statutes (Rev. to 2013) § 47a-21, commonly known as the security deposit statute,[1] (2) he violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (3) he was not entitled to certain damages under the lease agreements between the parties. The plaintiff cross appeals, claiming that the court abused its discretion by (1) declining to award him the full amount of attorney's fees he requested and (2) failing to rule on his request for punitive damages pursuant to CUTPA. With respect to the defendant's claims, we affirm in part and reverse in part the judgment of the trial court. With respect to the plaintiff's cross appeal, we vacate the order of the trial court regarding its award of attorney's fees and decline to address the plaintiff's claim regarding punitive damages.

The following relevant facts were found by the attorney trial referee and adopted by the court or otherwise are undisputed. At all relevant times, the defendant owned real property known as 209 Dolphin Cove Quay in Stamford (property) and had no prior experience as a landlord. In early 2011, the plaintiff entered into a written agreement to lease the property from the defendant for a period of approximately twelve months until May 31, 2012 (first lease).[2] The plaintiff commenced occupancy of the property on May 25, 2011. As the attorney trial referee expressly found, the parties subsequently communicated via e-mail correspondence "throughout and after the plaintiff's tenancy."

The parties executed a second lease agreement on March 1, 2012 (second lease). The term of that lease ran from June 1, 2012, to May 31, 2013. In accordance therewith, the plaintiff tendered payment of $8000 to the defendant as a security deposit. With respect to that payment, the second lease provides in relevant part: "[The defendant] will hold the [s]ecurity [d]eposit in accordance with the provisions of § 47a-21 . . . . If [the plaintiff] has carried out [his] promises under this [l]ease, [the defendant] shall return the [s]ecurity [d]eposit to [the plaintiff] within thirty (30) days after the termination of [the plaintiff's] tenancy. . . . If [the plaintiff] does not carry out [his] promises under this [l]ease, [the defendant] may use the [s]ecurity [d]eposit to pay the [r]ent or to repay [the defendant] for any damages [the defendant] has [sustained] because of [the plaintiff's] broken promises. . . . If [the defendant] keeps all or any part of [the plaintiff's] [s]ecurity [d]eposit, [the defendant] will, within the time required by law, give [the plaintiff] a list itemizing the nature

and amount of the damages [the defendant] has suffered because of [the plaintiff's] broken promises."

The plaintiff's tenancy concluded on May 31, 2013. On that date, the defendant conducted an inspection of the property with the plaintiff's brother-in-law, James Rumberger. Later that afternoon, the defendant sent the plaintiff an e-mail, in which he noted various "damage issues" that he had observed and asked the plaintiff to "[p]lease let me know by tomorrow . . . whether you are going to assume responsibility for repairing these [issues]." Although the plaintiff at trial acknowledged that he received that e-mail, there is no indication in the record that he ever responded to the defendant.[3]

On June 14, 2013, the defendant sent a detailed e-mail to the plaintiff regarding the plaintiff's alleged failure to comply with the terms of the lease agreements. In that correspondence, the defendant set forth seven specific items of damage to the property for which the plaintiff allegedly was responsible. The defendant also alleged that he had incurred $1422.86 in remediation expenses for the property and had sustained a loss of $10,000 due to his inability to rent the property for the month of June as a result of the damages caused by the plaintiff. The defendant further alleged that the plaintiff "never paid rent . . . for [his] occupancy of the [property] for the period commencing May 25, 2012, and ending May 31, 2012, or one week," which allegedly resulted in a $2000 loss to the defendant. At trial, the plaintiff acknowledged that he received the defendant's June 14, 2013 e-mail correspondence.

At the direction of his attorney, the plaintiff sent the defendant a letter via certified mail, return receipt requested, the next day, June 15, 2013. In that one sentence letter, the plaintiff provided his forwarding address to the defendant "for return of the $8000 security deposit under the [second] lease . . . ." That letter was addressed to 26 Homeside Lane in White Plains, New York, which was specified in the second lease as the defendant's address.[4] On July 28, 2013, the United States Postal Service returned that certified mailing to the plaintiff with the notation, "Return to Sender Unclaimed Unable to Forward," affixed thereon.

The plaintiff commenced this civil action four days later. His complaint contained three counts, all of which concerned the defendant's alleged failure to return his security deposit. In the first count, the plaintiff sought to recover his $8000 security deposit, along with interest and double damages pursuant to § 47a-21 (d) (2). In the second and third counts, the plaintiff alleged unjust enrichment and a CUTPA violation, respectively, stemming from the defendant's retention of the security deposit.[5]

In answering that complaint, the defendant admitted that the parties had entered into the second lease and

that the plaintiff had provided the $8000 security deposit. The defendant nevertheless denied the substance of all three counts of the plaintiff's complaint, stating: "[The defendant] denies the allegations . . . and further responds by stating that: (a) [the defendant] did not neglect to return the security deposit; (b) prior to the expiration of the term of the [second] lease, [the defendant] gave [the plaintiff] written notice of [the plaintiff's] failure and refusal to abide by the [l]ease; (c) within thirty (30) days of the end of the term of the [l]ease and [the plaintiff] vacating the premises, [the defendant] gave written notice of [the plaintiff's] failure and refusal to abide by the provisions of the [l]ease and the damages sustained by [the defendant] as a result thereof; (d) [the plaintiff] has not responded to various writings sent by [the defendant] itemizing damages sustained by [the defendant] as a result of [the plaintiff's] failure and refusal to abide by the provisions of the [l]ease; and (e) the damages sustained by [the defendant] as a result of [the plaintiff's] failure and refusal to abide by the provisions of the [l]ease are greater than the amount of the security deposit." The defendant further alleged that the plaintiff "has not complied with . . . statutes relating to security deposits . . . ."

In addition, the defendant raised three special defenses, alleging that (1) the court lacked personal jurisdiction over him, (2) the plaintiff had failed to provide "notice of an address to which the security deposit purportedly ought to be sent," and (3) the defendant provided the plaintiff "notice of the damages sustained by [the defendant] as a result of [the plaintiff's] failure and refusal to abide by the terms of the [second lease]" within thirty days of the expiration of that lease. The defendant also asserted a six count counterclaim against the plaintiff related to his alleged failure to abide by the terms of the second lease.[6]

A three day trial was held before the attorney trial referee in 2015, at which both parties testified.[7] The plaintiff presented documentary and testimonial evidence that he sent notice of his forwarding address to the defendant via certified mail. On that issue, the defendant testified that he "never received that letter, or any notice of a certified letter being sent to [him] by anyone" and that he never received notice that a certified letter "needed to be picked up."

The parties offered conflicting testimony on various damage to the property allegedly sustained during the plaintiff's tenancy. The defendant offered the testimony of Michael Curley, a licensed home improvement contractor, regarding repairs that he performed at the property in 2013. The plaintiff called Rumberger as a rebuttal witness, who had attended the inspection of the property with the defendant on May 31, 2013, and testified as to the alleged damage to the property. Rumberger also offered testimony regarding a video of the property

that he filmed on that date, which was played at trial and admitted into evidence as an exhibit.

In his subsequent report, the attorney trial referee found that the plaintiff had proven that he sent notice of his forwarding address to the defendant and that the defendant "presented no evidence or reason excusing his failure to collect the [c]ertified [m]ail sent to him by the plaintiff." The attorney trial referee further found that, in light of the mailbox rule,[8] "it must be concluded that the properly addressed and mailed letter was received, and . . . the defendant's lack of collection was intentional."

The attorney trial referee also found that the defendant's June 14, 2013 e-mail to the plaintiff "did not constitute an accounting of [the] plaintiff's security deposit, as it failed to indicate the amount of the plaintiff's security deposit, failed to note the amount of the interest accrued thereon, failed to list all damages and failed to list the amount of security being withheld for each alleged item of damage or even for all damages in the aggregate." Accordingly, the attorney trial referee found that the plaintiff "proved that he did not receive the return of any [of] his security deposit, nor did he receive an accounting detailing the amounts retained or the itemizing of the damages for which the security was being retained." The attorney trial referee found that the interest due on the security deposit was $46.62, and therefore recommended that judgment should enter in favor of the plaintiff on the first count of his complaint and that double damages totaling $16,093.24 should be awarded pursuant to § 47a-21 (d) (2).[9]

The attorney trial referee also concluded that the defendant had violated CUTPA, stating in relevant part: "Despite having such means available to account for the plaintiff's security deposit, the defendant failed to do so. . . . [B]y failing to recite the amount of [the] plaintiff's security or the interest accrued thereon, by failing to itemize the damages and their costs or even to include a total amount of purported damages, [the] defendant's [e-mail] to the plaintiff on June 14, 2013 . . . falls short of meeting [the] defendant's statutory obligations. Based upon the totality of the facts, it is found that the defendant was recklessly indifferent to the plaintiff's right to an accounting and engaged in wrongful conduct that offended public policy in violation of CUTPA." (Citation omitted.) The attorney trial referee thus recommended that judgment should enter in favor of the plaintiff on the third count of his complaint; he left to the court's discretion the question of whether to award attorney's fees or punitive damages on that count.

With respect to the defendant's counterclaim, the attorney trial referee found that the defendant had proven a total of $1506.45 in damages for which the plaintiff was responsible. The attorney trial referee

expressly rejected the defendant's other property damage claims and further found that the defendant "did not prove that the plaintiff failed to pay for a week of occupancy" or that "the damages caused by the plaintiff [were] even a cause, much less the . . . proximate cause of his inability to rent the property immediately." The attorney trial referee therefore recommended that judgment should enter in favor of the defendant on his counterclaim in the amount of $1506.45.

The defendant subsequently filed an objection to the attorney trial referee's report with the trial court. In that objection, the defendant argued that the attorney trial referee improperly (1) concluded that the plaintiff had provided proper notice of his forwarding address to the defendant, (2) concluded that the defendant had failed to provide an accounting of the alleged damage to the property, as required by § 47a-21 (d) (2), (3) concluded that he had violated CUTPA, (4) exceeded his proper role as fact finder by making legal conclusions that properly are the province of the trial court, and (5) rejected certain property damage claims alleged by the defendant. The court summarily overruled that objection by order dated September 22, 2016.

On that same date, the court issued notice of its judgment in favor of the plaintiff in the amount of $14,957.12. In so doing, the court failed to file a memorandum of decision, as required by Practice Book § 64-1. From that judgment, the defendant timely appealed to this court.

The plaintiff thereafter filed a motion for an award of attorney's fees with the trial court, to which the defendant objected. The plaintiff then filed a supplemental motion with the trial court, in which he requested an award of punitive damages pursuant to CUTPA.

On May 23, 2017, the defendant filed a motion with this court to secure a memorandum of decision from the trial court. This court granted that motion and ordered the trial court to file a memorandum of decision setting forth the factual and legal basis for its judgment in favor of the plaintiff. In response, the trial court issued an articulation on August 24, 2017, stating in relevant part: "The court finds that the attorney trial referee's report was . . . sufficiently detailed and [that he] clearly evaluated . . . all evidence presented at trial. The facts found by the attorney trial referee were based on the evidence presented and the reasonable inferences drawn therefrom. The court adopts all of the findings and recommendations contained in the attorney trial referee's report." The court thus awarded the plaintiff "$14,586.79 plus cost[s]." In light of the defendant's pending appeal, the court indicated that it had taken no action on the plaintiff's request for attorney's fees and punitive damages pursuant to CUTPA.

Due to the pendency of his claims for attorney's fees and punitive damages, the plaintiff filed a motion to dismiss the defendant's appeal for lack of a final judgment. This court granted that motion and dismissed the defendant's appeal in part. Weeks later, the parties filed a joint motion to stay the appeal "to permit the [trial court] to rule on all issues relating to [the] plaintiff's claims and to permit the parties to join all issues in one appeal," which this court granted.

The trial court then held a hearing on the plaintiff's motions for attorney's fees and punitive damages on May 18, 2018. At that hearing, the plaintiff's counsel reiterated that his affidavit of attorney's fees sought a total of $26,862.50 plus $549.33 in costs. In response, the defendant renewed his argument that there was no basis or evidence to support a finding of a CUTPA violation. For that reason, the defendant argued, an award of attorney's fees or punitive damages was unwarranted.

On June 25, 2018, the court issued an order on the plaintiff's motions, stating in full: "The court finds that an hourly rate of $175 [for] an action that is not overly complicated to be reasonable. Therefore, after a hearing on this matter and based on the attorney fee affidavit file in the case, the court awards attorney fees in the amount of $13,434.25."[10] From that ruling, the defendant appealed.[11]

On September 10, 2018, the defendant filed a motion for an articulation of the court's ruling on the plaintiff's request for attorney's fees, claiming that the court "did not address the issues raised by the [defendant] or explain the legal basis and grounds for an award of attorney's fees . . . ." On October 24, 2018, the plaintiff likewise requested an articulation of the court's decision "to include a ruling on the claim for CUTPA punitive damages." In response, the court issued an articulation on November 15, 2018, stating in relevant part: "The [attorney trial referee] found that the damages claimed by the [defendant] were either not suffered by the [defendant] or proven at trial as obligations of the [plaintiff] and, therefore, were not properly withheld by the [defendant] under § 47a-21 (d) (2). The language of the statute allows for landlords to deduct from a tenant's security deposit actual damages, not pretextual damages. . . . Based on the violations of [CUTPA] and the finding that the defendant's actions are a violation of CUTPA, and [§] 47a-21 (d) (2), the court finds an attorney fee's award in the amount of $13,434.28 to be appropriate in this matter under [General Statutes §] 42-110g."

Because that articulation was silent as to the plaintiff's motion for punitive damages, the plaintiff filed a motion for review with this court seeking an articulation on that issue. This court granted that motion and

ordered the trial court to articulate "whether it has ruled on the CUTPA punitive damages claim, and, if so, to state the order and provide the factual and legal basis for its ruling." On February 26, 2019, the trial court issued an articulation, in which it reiterated that it had found the attorney trial referee's findings to be "legally and logically consistent with the evidence and the law. There is sufficient evidence to support a CUTPA claim in this case." The court further stated that it had found "an attorney's fee award . . . to be appropriate in this matter" under CUTPA. The court did not address in any manner the plaintiff's request for punitive damages.[12] In response, the plaintiff filed a cross appeal to challenge both the amount of attorney's fees awarded by the court and the court's "failure to address" his claim for punitive damages. This court thereafter granted the defendant's motion to consolidate the plaintiff's cross appeal with the defendant's pending appeal.

Before considering the specific claims advanced by the parties, we note what is not in dispute. Pursuant to § 47a-21 (g), the plaintiff was entitled to bring an action for money damages "to reclaim any part of his security deposit which may be due." See also General Statutes § 47a-21 (*l*) ("[n]othing in this section shall be construed as a limitation upon . . . the right of any tenant to bring a civil action permitted by the general statutes or at common law"). On appeal, the defendant concedes that the plaintiff was entitled to bring an action to recover that portion of the security deposit not offset by damages sustained by the defendant as a result of the plaintiff's noncompliance with his obligations as a tenant. Because the defendant allegedly sustained damages that exceeded the amount of the security deposit and related interest, he nonetheless maintains that he did not violate the security deposit statute in the present case.

We also note the standard that governs our review of decisions in which the trial court has adopted the report of an attorney trial referee. As our Supreme Court has explained, "[w]hile the reports of [attorney trial referees] . . . are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based upon evidence, in the absence of errors of law, and the parties have no right to demand that the court shall determine the fact[s] thus found. . . . A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. . . . This court has articulated that attorney trial referees and [fact finders] share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court.
. . .

"Although it is true that when the trial court reviews the attorney trial referee's report the trial court may not retry the case and pass on the credibility of the witnesses, the trial court must review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report. . . .

"Finally, we note that, because the attorney trial referee does not have the powers of a court and is simply a fact finder, [a]ny legal conclusions reached by an attorney trial referee have no conclusive effect. . . . The reviewing court is the effective arbiter of the law and the legal opinions of [an attorney trial referee], like those of the parties, though they may be helpful, carry no weight not justified by their soundness as viewed by the court that renders judgment. . . . Where legal conclusions are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts found by the . . . referee." (Internal quotation marks omitted.) *Hees* v. *Burke Construction, Inc.*, 290 Conn. 1, 6–7, 961 A.2d 373 (2009).

I

THE DEFENDANT'S APPEAL

A

The defendant first claims that the court improperly concluded that he violated the security deposit statute and awarded the plaintiff double damages. He contends that both the attorney trial referee and the trial court construed the relevant provisions of § 47a-21 (d) (2) in an overly restrictive fashion, and submits that the written statement that he furnished to the plaintiff within thirty days of the termination of the plaintiff's tenancy satisfied those statutory requirements.[13] We agree.

At the outset, we note that our appellate courts "accord plenary review to the court's legal basis for its damages award. . . . The court's calculation under that legal basis is a question of fact, which we review under the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Carrillo* v. *Goldberg*, 141 Conn. App. 299, 307, 61 A.3d 1164 (2013). Moreover, to the extent that we must construe the salient provisions of the security deposit statute, our review is plenary. See *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 213, 38 A.3d 1183 (statutory interpretation presents question of law subject to plenary review), cert. denied, 568 U.S. 940, 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012).

At the time that the plaintiff commenced this action,[14] the double damages subdivision of the security deposit statute provided in relevant part: "Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days

after termination of a tenancy, each landlord other than a rent receiver shall deliver to the tenant or former tenant at such forwarding address either (A) the full amount of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section, or (B) the balance of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section *after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations, together with a written statement itemizing the nature and amount of such damages.* Any such landlord who violates any provision of this subsection shall be liable for twice the amount or value of any security deposit paid by such tenant . . . ." (Emphasis added.) General Statutes (Rev. to 2013) § 47a-21 (d) (2).

As this court has observed, § 47a-21 (d) (2) "imposes liability for twice the value of any security deposit on a landlord who violates the provisions of that subsection." *Kufferman* v. *Fairfield University*, 5 Conn. App. 118, 121–22, 497 A.2d 77 (1985). It is the "punitive damages" portion of the security deposit statute. See *Yorgensen* v. *Brophy Ahern Development Co.*, 66 Conn. App. 833, 834, 787 A.2d 1 (2001), cert. denied, 259 Conn. 930, 793 A.2d 1087 (2002); *Reich* v. *Langhorst*, 44 Conn. App. 381, 382, 689 A.2d 1134 (1997).

By its plain language, § 47a-21 (d) (2) obligates a landlord, within thirty days of the termination of the tenancy,[15] to deliver to the tenant either (a) the full amount of the security deposit or (b) any remaining balance on that security deposit "after deduction for any damages suffered by [the] landlord by reason of [the] tenant's failure to comply with [the] tenant's obligations . . . ." When the latter scenario is implicated, § 47a-21 (d) (2) requires the landlord to provide the tenant "with a written statement itemizing the nature and amount of such damages." It is undisputed that, in the present case, the defendant provided a written statement to the plaintiff within thirty days of the termination of the tenancy.[16] The question, then, is whether that written statement comports with the statutory requirements.

In his June 14, 2013 written statement, the defendant first noted that, under the terms of the 2012 lease, he was entitled to use the security deposit in question " 'to repay the [defendant] for any damages' " sustained as a result of the plaintiff's failure to comply with his obligations as a tenant. The defendant then noted that he had sent the plaintiff an e-mail on the day that his tenancy terminated, in which he "gave [the plaintiff] notice of a variety of [items] that were damaged and for which [the plaintiff] was responsible," and reiterated that, "[w]ith respect to some of these items [he] was and continues to be prepared to allow [the plaintiff] to repair same . . . ."[17] The defendant then enumerated

seven specific "items" of damage to the property for which the plaintiff allegedly was responsible, some of which the defendant offered the plaintiff an opportunity to repair.[18] The defendant also recited various obligations on the part of the tenant contained in the lease agreements between the parties,[19] and claimed that the plaintiff's "failure as the [t]enant to abide by the foregoing obligations" and his unreasonable withholding of consent for the defendant to make necessary repairs[20] resulted in a loss of "not less than $10,000" to the defendant. More specifically, the defendant alleged that he had incurred $1422.86 in remediation expenses "because [the plaintiff] allowed water and mud to accumulate in the crawl space of the [property] and did not advise [him] of that condition," and that "an individual who was prepared to lease the [property] commencing [in] June, 2013 refused to do so" due to that condition, which caused a loss of "not less than one month's rent, or $10,000." Last, the defendant alleged that the plaintiff had "never paid rent or compensated [the defendant] for [his] occupancy of the [property] for the period commencing May 25, 2012 and ending May 31, 2012, or one week. The reasonable value of such occupancy, based on the rents . . . paid [by the plaintiff] pursuant to the [lease agreements] is $2000."

The total amount of the damages alleged in the defendant's written statement far exceeds the $8000 security deposit and $46.62 accrued interest.[21] It, therefore, is not surprising that the defendant did not identify any remaining balance of the security deposit in that written statement to the plaintiff.

As this court has explained, "[f]or purposes of determining whether to award double damages under [§ 47a-21 (d) (2)] a court need only determine whether a landlord complied with the statutory requirements, and need not determine whether the landlord's reason for withholding the security deposit was justified." *Pedrini* v. *Kiltonic*, 170 Conn. App. 343, 350–51, 154 A.3d 1037, cert. denied, 325 Conn. 903, 155 A.3d 1270 (2017). Because he was alleging damages caused by the plaintiff that exceeded the amount of the security deposit, § 47a-21 (d) (2) required the defendant to furnish the plaintiff with "a written statement itemizing the nature and amount" of those damages. We agree with the defendant that his June 14, 2013 written statement complied with that statutory imperative. That written statement was provided to the plaintiff within thirty days of the termination of his tenancy and detailed numerous "items" of damage allegedly caused by the plaintiff that, in total, exceeded the $8000 security deposit by thousands of dollars.

In concluding that the defendant violated § 47a-21 (d) (2), the attorney trial referee found that the defendant's June 14, 2013 written statement to the plaintiff "did not constitute an accounting of [the] plaintiff's security

deposit, as it failed to indicate the amount of the plaintiff's security deposit, failed to note the amount of the interest accrued thereon, failed to list all damages and failed to list the amount of security being withheld for each alleged item of damage or even for all damages in the aggregate." The attorney trial referee provided no legal authority for the imposition of those requirements, which are not set forth in § 47a-21 (d) (2). We reiterate that the plain language of that statute merely requires a landlord asserting damages stemming from noncompliance with the tenant's obligations to provide the tenant with "a written statement itemizing the nature and amount of such damages." General Statutes (Rev. to 2013) § 47a-21 (d) (2). When the amount of the alleged damages far exceeds the security deposit and interest, as is the case here, nothing more is statutorily required.

Although it may be preferable for a landlord in such instances to include an explicit statement indicating that no balance remains because the amount of the alleged damages exceeds the amount of the security deposit and interest, we decline to construe the written statement requirement of § 47a-21 (d) (2) in such a hypertechnical manner. Moreover, to the extent that there is any ambiguity in the written statement requirement, we are mindful that § 47a-21 (d) (2) is the punitive damages subdivision of the security deposit statute and therefore eschew a rigid construction against the party who would be subject to its punitive consequences.[22] See *Branford* v. *Santa Barbara*, 294 Conn. 803, 814–15, 988 A.2d 221 (2010). We therefore conclude that the written statement the defendant provided to the plaintiff complied with the requirements of § 47a-21 (d) (2), as it sufficiently apprised the plaintiff that the defendant was alleging damages caused by the plaintiff's failure to comply with his obligations as a tenant that exceeded the amount of his security deposit. For that reason, the attorney trial referee improperly recommended, and the court wrongly awarded, double damages pursuant to § 47a-21 (d) (2). See *Pedrini* v. *Kiltonic*, supra, 170 Conn. App. 352 (plaintiff tenant not entitled to double damages because defendant landlord "sent a written notification of damages to the plaintiff within the thirty day time limitation" and "the amount of claimed damages exceeded the amount of the security deposit, and, therefore, there was no balance to return to the plaintiff").

B

The defendant next challenges the conclusion that he violated our unfair trade practices act. "CUTPA provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate

review, we accord our customary deference." (Citation omitted; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 699, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011). Whether a defendant is subject to CUTPA and its applicability, however, are questions of law. Id., 700. "[If] a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record." (Internal quotation marks omitted.) Id., 701.

On appeal, the defendant contends that the attorney trial referee improperly predicated his CUTPA finding on a basis that was not advanced by the plaintiff in this action—namely, the defendant's purported failure to provide a written statement of damages pursuant to § 47a-21 (d) (2). The defendant also claims that the trial court improperly concluded that CUTPA damages were warranted because the defendant's written statement was pretextual in nature, despite the fact that no such finding was made by the attorney trial referee. We address each claim in turn.

1

The defendant first argues that the attorney trial referee improperly predicated his CUTPA finding on a basis that was not asserted by the plaintiff. The following additional facts are relevant to that claim.

In count one of his complaint, the plaintiff alleged in relevant part that the defendant had violated the security deposit statute because he had "refused and neglected to return the security deposit." For that reason, the plaintiff alleged that he was entitled to interest and double damages pursuant to § 47a-21 (d) (2). In count three of his complaint, the plaintiff set forth a two paragraph CUTPA claim. After incorporating by reference the allegations of the first count, the plaintiff alleged: "The action of the defendant constitutes violations of [CUTPA], in that said action was immoral, oppressive and unscrupulous, and caused substantial injury to the plaintiff." No further factual allegations are contained in count three of the plaintiff's complaint.

After the plaintiff rested his case at trial, the defendant offered the testimony of Elaine Betzios, a real estate agent, regarding "the damages suffered by" the defendant and his inability to rent the property following the termination of the plaintiff's tenancy in particular. Early in her testimony, Betzios testified that she showed the property to a prospective tenant who was interested in renting the property in 2013. When she then was asked why the tenant had not rented the property, the plaintiff objected on, inter alia, hearsay grounds. In response, the defendant's counsel reminded

the attorney trial referee that the plaintiff had alleged a CUTPA violation and argued that Betzios' testimony "certainly goes to the mental state of the defendant as to whether or not he committed a CUTPA violation, what's going on in his mind, was he performing some kind of unscrupulous, immoral type of act under CUTPA." When the attorney trial referee inquired how a third-party statement of a prospective tenant affected the defendant's mental state, the defendant's counsel replied: "Because [the defendant] believes that he has a damage claim for failing to be able to relet the property and, therefore, he has a good faith legitimate basis to withhold the security deposit for those damages."

Soon thereafter, the following colloquy ensued:

"[The Attorney Trial Referee]: It's [an] out-of-court statement. How is [Betzios'] out-of-court statement not hearsay here?

"[The Defendant's Counsel]: Because it doesn't go to the truth of the matter asserted. It goes to the [defendant's] mental state, which, with CUTPA violations, we're going to get into what someone's mental state is. So, [the] out-of-court statement is not for the truth of the matter asserted. It is to show what [the defendant] was thinking and [what] information he had in his possession to justify keeping the security deposit.

"[The Attorney Trial Referee]: Okay. Hang on one second. I have a question. Is the genesis of the CUTPA violation *solely* the failure to return the security deposit under the statute so that the mens rea necessary for the CUTPA violation is a finding on the security deposit statute?

"[The Plaintiff's Counsel]: Exactly.

"[The Attorney Trial Referee]: Okay. So—

"[The Plaintiff's Counsel]: *It's a per se violation of CUTPA.*

"[The Attorney Trial Referee]: Okay. . . .

\* \* \*

"[The Attorney Trial Referee]: . . . I don't think you need to go into the issues . . . of an independent CUTPA analysis in dealing with that evidence and trying to disprove it because if it's not a per se violation to violate the security deposit statute, if that's not a per se violation of CUTPA, the plaintiff is going to lose their CUTPA claim.

"[The Defendant's Counsel]: I understand.

"[The Attorney Trial Referee]: Because they haven't alleged or pleaded anything else—

"[The Defendant's Counsel]: Right.

"[The Plaintiff's Counsel]: Mm hmm.

"[The Attorney Trial Referee]: —other than that to

show a CUTPA violation.

"[The Defendant's Counsel]: Right, right. So, the—

"[The Attorney Trial Referee]: So, it's either per se or it's not.

"[The Defendant's Counsel]: Right.

"[The Attorney Trial Referee]: Or it's [not] per se or they can't prevail.

"[The Plaintiff's Counsel]: *That's correct.*" (Emphasis added.)

As the colloquy over Betzios' testimony wound down, the attorney trial referee further stated: "[I]t seems to me that . . . if a violation of . . . the security deposit statute does not create in and of itself the CUTPA violation, then the plaintiff can't prevail on the CUTPA violation because the plaintiff has elicited no other evidence of CUTPA. They have not elicited anything about unscrupulous, immoral, unethical conduct separate and apart from violating the security deposit statute if that is [in] and of itself sufficient to create a CUTPA violation, similar to violating the [Home Improvement Act, General Statutes § 20-418 et seq.]. If you don't comply with the Home Improvement Act, it's a per se violation of CUTPA. . . . I'm hearing the same argument being made [regarding the security deposit statute]. . . . If that's the case, then maybe it is [a violation of CUTPA]. If it's not the case, then the plaintiff [is] sunk on that count." At that time, the defendant's counsel stated that he had no further questions for Betzios "in light of the discussion and the objection," and Betzios' testimony concluded.

Although the attorney trial referee at trial explicitly stated, and the plaintiff's counsel confirmed, that the plaintiff's sole claim was that the failure to comply with § 47a-21 constituted a per se violation of CUTPA, the CUTPA finding in his report was predicated on an altogether different basis. In that report, the attorney trial referee stated in relevant part: "Even if one were to ignore the fact that [the] defendant must be considered to have 'received' the plaintiff's forwarding address, the defendant had the means, namely, a working [e-mail] address, to contact the plaintiff for purposes of accounting for his security deposit. . . . Despite having such means available to account for the plaintiff's security deposit, the defendant failed to do so. . . . [B]y failing to recite the amount of [the] plaintiff's security or the interest accrued thereon, by failing to itemize the damages and their costs or even to include a total amount of purported damages, the defendant's [e-mail] to the plaintiff on June 14, 2013 . . . falls short of meeting [his] statutory obligations. Based upon the totality of the facts, it is found that the defendant was recklessly indifferent to the plaintiff's right to an accounting and engaged in wrongful conduct that offended public policy in violation of CUTPA." (Citations omitted.)

We conclude that the attorney trial referee's conclusion is flawed in two respects. First, it is predicated on a basis that was not raised by the plaintiff in his complaint. As our Supreme Court has explained, "[t]he principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Citations omitted; internal quotation marks omitted.) *Matthews* v. *F.M.C. Corp.*, 190 Conn. 700, 705, 462 A.2d 376 (1983). "More than one century ago, our Supreme Court held that [w]hen the facts upon which the court in any case founds its judgment are not averred in the pleadings, they cannot be made the basis for a recovery. . . . The vitality of that bedrock principle of Connecticut practice is unquestionable." (Citation omitted; internal quotation marks omitted.) *Michalski* v. *Hinz*, 100 Conn. App. 389, 393, 918 A.2d 964 (2007). Accordingly, "a plaintiff's theories of liability, and the issues to be tried, are limited to the allegations [in the] complaint." (Internal quotation marks omitted.) *Williams* v. *Housing Authority*, 327 Conn. 338, 397, 174 A.3d 137 (2017). Nowhere in his complaint or answer to the defendant's special defenses did the plaintiff challenge the adequacy of the written statement of damages provided by the defendant. Moreover, both the attorney trial referee and the plaintiff's counsel acknowledged at trial that the sole theory of recovery under CUTPA presented by the plaintiff was the per se violation theory. For that reason, the attorney trial referee improperly went beyond that theory in finding a CUTPA violation in the present case.

Second, on its merits, the conclusion reached by the attorney trial referee is untenable. Whether under a per se violation theory or one predicated on the inadequacy of the written statement provided by the defendant, the plaintiff cannot prevail. This court previously has rejected a claim that a landlord's "failure to comply with § 42a-21 (d) (2) is a per se CUTPA violation"; *Pedrini* v. *Kiltonic*, supra, 170 Conn. App. 353; when the landlord had "complied with the statutory requirements" by sending "a written notification of damages to the plaintiff within the thirty day time limitation" and "the amount of claimed damages exceeded the amount of the security deposit [leaving] no balance to return to the plaintiff . . . ." Id., 352. That precedent compels a similar result here. Because we have concluded that the June 14, 2013 written statement of damages provided by the defendant to the plaintiff satisfied the statutory requirements of § 47a-21 (d) (2); see part I A of this opinion; the attorney trial referee improperly found a CUTPA violation on the basis of the inadequacy of that written statement.

2

The defendant also claims that the trial court improperly concluded that CUTPA damages were warranted

because the defendant's written statement of damages was pretextual in nature, despite the fact that no such finding was made by the attorney trial referee. We agree.

As we have noted, the plaintiff's CUTPA pleadings are sparse, alleging merely that the defendant's neglect and refusal to return his security deposit constituted a CUTPA violation "in that said action was immoral, oppressive and unscrupulous, and caused substantial injury to the plaintiff." The plaintiff did not allege in his complaint that the damages claimed by the defendant in his written statement were pretextual.[23] More importantly, the attorney trial referee never made such a factual finding in his report. To be sure, the attorney trial referee found that several of the items of damage claimed by the defendant were not proven at trial.[24] At the same time, the attorney trial referee also found that the defendant *had* proven other damages for which the plaintiff was liable.[25]

Later in his report, the attorney trial referee stated that the defendant "met his burden of proof and proved by a preponderance of the evidence that the plaintiff either caused or should be held liable for certain damages to the property." The attorney trial referee then emphasized that the defendant "did not meet his burden of proof and did not prove the balance of the physical damage claims set forth in his [counterclaim]."[26]

Pretext is a question of fact. See *State* v. *Holmes*, 334 Conn. 202, 226, 221 A.3d 407 (2019) (whether pretext exists is factual question subject to clearly erroneous review); see also *Murray* v. *Groose*, 106 F.3d 812, 814 (8th Cir.) ("[t]he existence of pretext is a question of fact"), cert. denied, 522 U.S. 851, 118 S. Ct. 141, 139 L. Ed. 2d 88 (1997); *Cornwell* v. *Robinson*, 23 F.3d 694, 706 (2d Cir. 1994) (claims of pretext are "pure questions of fact" governed by clearly erroneous standard of review (internal quotation marks omitted)). In his report, the attorney trial referee did not find the defendant's claimed damages to be pretexual; indeed, that word appears nowhere in his report. Instead, he found those damages unproven. Furthermore, the attorney trial referee did not predicate his finding that the defendant violated CUTPA on such a basis. That conclusion was based on the defendant's purported failure to provide an adequate written statement of damages pursuant to § 47a-21 (d) (2), not on any finding of pretext.

The record before us indicates that the report of the attorney trial referee is silent on the issue of pretext. So, too, is the trial court's September 22, 2016 notice of judgment. When this court subsequently ordered the trial court to articulate the factual and legal basis of its judgment, the court issued an articulation on August 24, 2017, that again made no mention of pretext.

It was only on November 15, 2018—more than two years after it had rendered judgment in the present

case—that the court first raised the issue of pretext. In articulating the basis of its award of attorney's fees under CUTPA, the court stated in relevant part: "The [attorney trial referee] found that the damages claimed by the [defendant] were either not suffered by the [defendant] or proven at trial as obligations of the [plaintiff] and, therefore, were not properly withheld by the [defendant] under § 47a-21 (d) (2). The language of the statute allows for landlords to deduct from a tenant's security deposit actual damages, not pretextual damages. *Carrillo* v. *Goldberg*, [supra, 141 Conn. App. 310]."

The court's reference to "pretextual damages" is troubling for several reasons. First and foremost, the attorney trial referee never made such a finding. Although he found some of the defendant's claimed damages unproven, the attorney trial referee did not find them to be pretextual. Because those findings are supported by the evidence adduced at trial, the court was obligated to accept them and was not at liberty to substitute its own findings for those of the trier of fact. *Hees* v. *Burke Construction, Inc.*, supra, 290 Conn. 6–7. In making its own determination that the defendant's claim of damages was pretextual, the court disregarded that fundamental precept.

Second, the court's recitation of precisely what the attorney trial referee determined with respect to the defendant's damages is inaccurate. The attorney trial referee did *not* find "that the damages claimed by the [defendant] were either not suffered by the [defendant] or proven at trial as obligations of the [plaintiff]," as the court stated in its November 15, 2018 articulation. To the contrary, the attorney trial referee found that the defendant had proven several of his claimed damages, for which the plaintiff was liable. See footnote 25 of this opinion. For that reason, the attorney trial referee recommended that judgment should enter in favor of the defendant on his counterclaims in the amount of $1506.45—a recommendation that the court expressly adopted in its judgment.

Third, in making its own determination that the defendant's claimed damages were pretextual, the court improperly invoked this court's decision in *Carrillo* v. *Goldberg*, supra, 141 Conn. App. 299. *Carrillo* was an extraordinary case, as the defendant landlords had mishandled the security deposit funds and, following the termination of the tenancy, had sent the plaintiff tenants a concededly fraudulent statement of damages. Id., 303–305. At trial, the defendants admitted that they "were not entitled to any of the sum claimed as damages in [the] accounting sent to the plaintiffs, except for $231.80 in fuel oil expenses." Id., 305. As a result, the trial court found that "the defendants' claimed damages were pretextual, that is, they were calculated to camouflage the defendants' mishandling of the plaintiffs' security deposit." Id., 310. In concluding that an award of double

damages was warranted, this court stated: "[T]he damages claimed by the defendants were neither suffered by the defendants nor created by the plaintiffs' failure to comply with their obligations as tenants. Rather, they were simply fabricated by the defendants and, therefore, were not properly withheld by the defendants under § 47a-21 (d) (2). The language of the statute allows for landlords to deduct from a tenant's security deposit actual damages, not pretextual damages. While the defendants complied, in form only, with the requirement that a written accounting of damages be sent to the former tenant within the time frame prescribed by [the security deposit statute] . . . they did not satisfy the statutory requirements." Id., 310–11.

By contrast, it is undisputed that the defendant in the present case immediately alerted the plaintiff to the alleged damage to the property, both through verbal communication with the plaintiff's brother-in-law and via e-mail correspondence, on the very day that the tenancy terminated. The defendant then sent a written statement of damages that detailed various items of damage to the property, some of which the attorney trial referee found proven following trial. See footnote 25 of this opinion. Equally significant, the attorney trial referee did not find that the other damages claimed by the defendant were "pretextual" or "fabricated"; he simply found that the defendant had not satisfied his burden of proof with respect to those damages. For that reason, *Carrillo* is inapposite to the present case.

In light of the foregoing, the finding of a CUTPA violation cannot stand. We, therefore, conclude that the court improperly rendered judgment in favor of the plaintiff on the third count of his complaint.

### C

The defendant also claims that the court improperly accepted the attorney trial referee's findings that he was not entitled to damages on his third and fifth counts of his counterclaim. We disagree.

"We accord plenary review to the court's legal basis for its damages award. . . . The court's calculation under that legal basis is a question of fact, which we review under the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Carrillo* v. *Goldberg*, supra, 141 Conn. App. 307. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *McKay* v. *Longman*, 332 Conn. 394, 417, 211 A.3d 20 (2019). In addition, we note that, "[i]t is within the province of the [attorney trial referee], when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to

be given the evidence." (Internal quotation marks omitted.) *Reid* v. *Landsberger*, 123 Conn. App. 260, 281, 1 A.3d 1149, cert. denied, 298 Conn. 933, 10 A.3d 517 (2010). "No one other than the attorney trial referee is authorized to assess the credibility of the witnesses who appear before him." *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 347, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002). For these reasons, this court on appeal "cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *McKay* v. *Longman*, supra, 417.

1

The defendant claims that the court improperly accepted the finding of the attorney trial referee that he was not entitled to $1422.86 in damages on the third count of his counterclaim. We disagree.

In his third count, the defendant alleged in relevant part that the plaintiff had breached the terms of the lease agreements by "allow[ing] water and mud to accumulate in the crawl space of the [property] and neither repaired same nor advised [the defendant] of the accumulation of water and mud in the crawl space. . . . As a consequence of the foregoing, [the defendant] sustained further damages in the amount of $1422.86 to repair the damage."

In his report, the attorney trial referee found that the defendant had "credibly established that mud was discovered in the crawl space" in question. He nonetheless found that the defendant had not proven that this "condition occurred after the plaintiff [took] possession" of the property in May, 2011. As the attorney trial referee stated: "[T]he question of how and when the condition occurred is critical, since the property fronts on the water and the plaintiff occupied the [property] during a period of time that included two major Atlantic hurricanes that severely impacted the Connecticut coastline. Without establishing when the condition was created or that the plaintiff did something to cause the condition to occur, or for that matter was even aware of the condition, this claim [of damages] cannot be credited." He further found that the defendant "failed to prove that there was any nexus between the plaintiff's conduct and the accretion of mud and/or water in the crawl space" and had "failed to prove that the plaintiff was even aware that mud or water accreted in the crawl space."

The evidence in the record before us supports that determination. The defendant offered no evidence at trial as to precisely when the accumulation of mud occurred. Moreover, the home improvement contractor hired by the defendant to perform repairs on the property in June, 2013, testified at trial that the mud in the crawl space "looked like it had been there for some

time" and that he did not know when the mud came into the crawl space. Although the defendant claimed that "the crawl space was immaculate" at the time that the plaintiff's tenancy commenced, the attorney trial referee, as the sole arbiter of credibility, was free to reject that assertion. He likewise was free to credit the plaintiff's unequivocal testimony that he did not allow water and mud to accumulate in the crawl space. See *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, supra, 72 Conn. App. 347.

We agree with the attorney trial referee that there is no evidence that the plaintiff was aware, never mind the cause, of the accumulation of mud in the crawl space. For that reason, his finding that the defendant was not entitled to $1422.86 in damages on the third count of his counterclaim is not clearly erroneous.

2

The defendant also claims that the court improperly accepted the finding of the attorney trial referee that he was not entitled to $2000 in damages for an unpaid week of rent under the terms of the first lease. We do not agree.

The applicable standard that guides our review is well established. "The defendant's claim presents a question of contract interpretation because a lease is a contract, and, therefore, it is subject to the same rules of construction as other contracts. . . . Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . In construing a written lease . . . three elementary principles must be [considered]: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7–8, 931 A.2d 837 (2007).

In the fifth count of his counterclaim, the defendant alleged in relevant part that the plaintiff had "failed and refused to pay for the use and occupancy of the [property] for the period [from] May 25, 2012, to May 31, 2012." His claim stems in large part from what the attorney trial referee aptly described as an "open-ended commencement date for the first lease." The first lease specifies the "lease term" as follows: "The term of this [l]ease . . . shall commence on the date that [the plain-

tiff] commences occupancy of the [d]welling which date shall not be before May 15, 2011, and shall not be after May 31, 2011 . . . . [The lease] shall end May 31, 2012 . . . ." The first lease further obligated the plaintiff to pay rent on a monthly basis, which payment was "due on the [c]ommencement [d]ate and on the same date of each month thereafter."

In concluding that no damages were warranted on the fifth count, the attorney trial referee rejected the defendant's claim that "some amount of pro rata rent is due," reasoning that the first lease "neither . . . indicates [nor] implies an agreement that pro rata rent would be due for the variable commencement window at the beginning of the first lease." The attorney trial referee emphasized that, under the plain terms of the first lease, "the commencement date [was] left open to fall anywhere between May 15 and May 31, depending on when the defendant could move out of the premises." He further found that "the parties were free to, and did, elect to negotiate a somewhat open-ended commencement date for the first lease. The parties did not, however, agree that additional rent would be due for the variable commencement date period of time. The defendant cannot now add such a term."

We agree with that determination. In addition, we note that the first lease expressly contemplated the scenario in which monthly rent is "apportioned to the number of days that [the plaintiff] occupies the [property]" in the event that either party exercised the right to early termination of the lease. The parties thus plainly knew how to add a provision imposing a pro rata payment obligation in their lease agreement. They nevertheless declined to do so with respect to the open-ended commencement date of the first lease. We, therefore, conclude that the court properly adopted the attorney trial referee's determination that the defendant was not entitled to $2000 in damages on the fifth count of his counterclaim.

## II

### THE PLAINTIFF'S CROSS APPEAL

In his cross appeal, the plaintiff claims that the court improperly (1) declined to award him the full amount of attorney's fees requested and (2) failed to rule on his request for punitive damages pursuant to CUTPA. In light of our conclusion in part I B of this opinion that the court improperly rendered judgment in favor of the plaintiff on the CUTPA count of his complaint, there is no basis for the plaintiff's recovery of attorney's fees pursuant to § 42-110g. See *Winakor* v. *Savalle*, 198 Conn. App. 792, 811, 234 A.3d 1122, cert. granted on other grounds, 335 Conn. 958, 239 A.3d 319 (2020); *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 280, 89 A.3d 373 (2014). Accordingly, we vacate the order of the court awarding the plaintiff $13,434.28 in attorney's

fees pursuant to CUTPA.

For similar reasons, we decline to address the plaintiff's challenge to the court's failure to rule on his request for punitive damages pursuant to CUTPA. As our Supreme Court has observed, because "the defendant did not violate CUTPA, we need not address whether the trial court abused its discretion by not awarding . . . punitive damages to the plaintiffs as part of the CUTPA award." *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 691 n.13, 697 A.2d 1137 (1997). Because there was no CUTPA violation in the present case, no punitive damages can be awarded pursuant to CUTPA.

The judgment is reversed only with respect to the claim alleging a violation of CUTPA and as to the award of double damages pursuant to § 47a-21 (d) (2), and the case is remanded with direction to vacate the award of attorney's fees and to recalculate the damages award in accordance with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] All references to § 47a-21 in this opinion are to the 2013 revision of that statute.

[2] The first lease specifies the "lease term" as follows: "The term of this [l]ease . . . shall commence on the date that [the plaintiff] commences occupancy of the [d]welling which date shall not be before May 15, 2011, and shall not be after May 31, 2011 . . . . [The lease] shall end May 31, 2012 . . . ." In his report, the attorney trial referee specifically found that the first lease "was for a term of between one year and one year and two weeks, depending upon an open-ended commencement date running from a date between May 15 and May 31, 2011, and May 31, 2012."

[3] At trial, the plaintiff admitted that the defendant continued to communicate with him via e-mail after the plaintiff had vacated the property and that he had "received several e-mails [from the defendant] making allegations about the condition of the [property] upon our departure . . . ." In his testimony, the defendant stated that the plaintiff had not responded to his e-mails that were sent following the termination of the plaintiff's tenancy.

[4] At trial, the defendant testified that 26 Homeside Lane in White Plains was his current address and that it was his address in June, 2013.

[5] After incorporating by reference the allegations of the first count, count three of the complaint states in full: "The action of the [d]efendant constitutes violations of [CUTPA], in that said action was immoral, oppressive and unscrupulous and caused substantial injury to the plaintiff."

[6] In those counts, the defendant alleged that, pursuant to the terms of the second lease, he was entitled to retain the security deposit due to (1) "physical damage" to the property for which the plaintiff was responsible, (2) the plaintiff's failure to "pay charges of the [Stamford] Water Pollution Control Authority," (3) the plaintiff's allowance of water and mud in the crawl space of the property and his failure to repair or notify the defendant of that condition, (4) the plaintiff's refusal to allow the defendant to make necessary repairs to the property during the lease term, (5) the plaintiff's failure to "pay for the use and occupancy of the [property] for the period [commencing on] May 25, 2012 [and ending on] May 31, 2012," and (6) additional damages to the property caused by the plaintiff.

[7] In his report, the attorney trial referee found the testimony of both parties to be generally credible, stating: "On balance, while [the attorney trial referee] did not necessarily believe every utterance or agree with every conclusion asserted by any witness, each witness was found to be generally credible and appeared to be testifying to the best of their recollection and with the intent to testify honestly."

[8] "The mailbox rule, a general principle of contract law, provides that a properly stamped and addressed letter that is placed into a mailbox or handed over to the United States Postal Service raises a rebuttable presumption that it will be received." (Internal quotation marks omitted.) *Butts* v.

*Bysiewicz*, 298 Conn. 665, 677 n.8, 5 A.3d 932 (2010). For a thorough discussion of the mailbox rule in the context of certified mail, see *Aurora Loan Services*, *LLC* v. *Condron*, 181 Conn. App. 248, 262–73, 186 A.3d 708 (2018).

[9] In light of that conclusion, the attorney trial referee concluded that the plaintiff could not prevail on his unjust enrichment count. The trial court agreed and rendered judgment in favor of the defendant on that count. The plaintiff does not challenge the propriety of that determination in this appeal.

[10] In his affidavit of attorney's fees, the plaintiff's counsel had specified an hourly rate of $350.

[11] By order dated October 31, 2018, this court ordered that appeal to "be treated as an amended appeal . . . ."

[12] The plaintiff filed an additional motion for review with this court, claiming that the trial court had provided "no further explanation either granting or denying punitive damages, let alone explaining why." For that reason, the plaintiff argued, further articulation of the court's decision was necessary. By order dated May 7, 2019, this court granted review but denied the relief requested.

[13] The defendant also claims that the court improperly concluded that he violated the security deposit statute because the plaintiff failed to establish that the defendant had received written notice of his forwarding address, which the defendant argues is a prerequisite to recovery under § 47a-21 (d) (2). See *Johnson* v. *Mazza*, 80 Conn. App. 155, 160, 834 A.2d 725 (2003) ("a tenant is first required to provide a forwarding address to a landlord to be afforded the opportunity to receive the double damages remedy under § 47a-21 (d) (2)"). The defendant maintains that, read together, subdivisions (2) and (4) of § 47a-21 (d) require actual receipt by the landlord of the tenant's forwarding address to trigger the time limitations contained therein. See footnote 15 of this opinion. In light of our conclusion that the defendant properly provided a written statement itemizing the nature and amount of the damages allegedly suffered as a result of the plaintiff's noncompliance with his obligations as a tenant, we do not consider that alternative contention.

[14] Section 47a-21 (d) (2) subsequently was amended by Public Acts 2016, No. 16-65, § 37, in ways immaterial to the present appeal.

[15] We recognize that the security deposit statute, as it existed at the time that the plaintiff commenced this action, contained an additional subdivision that concerned a landlord's receipt of written notice of the tenant's forwarding address. General Statutes (Rev. to 2013) § 47a-21 (d) (4) provides: "Any landlord who does not have written notice of his tenant's or former tenant's forwarding address shall deliver any written statement and security deposit due to the tenant, as required by subdivision (2) of this subsection, within the time required by subdivision (2) of this subsection or within fifteen days *after receiving written notice* of such tenant's forwarding address, whichever is later." (Emphasis added.) For purposes of the present analysis, which is focused on the propriety of the defendant's written statement of damages to the plaintiff, we assume, arguendo, that the court correctly determined that the plaintiff provided proper notice of his forwarding address in accordance with § 47a-21 (d) (2).

[16] The defendant's written statement came in the form of an e-mail sent to the plaintiff on June 14, 2013. At trial, the plaintiff acknowledged that he received the defendant's June 14, 2013 e-mail correspondence. Moreover, the plaintiff on appeal raises no claim regarding the manner in which the defendant furnished his written statement of damages.

[17] In his May 31, 2013 e-mail to the plaintiff, which was admitted into evidence at trial, the defendant stated in relevant part: "After [Rumberger] left [the property] this morning, I noticed three additional damage issues (i) that [I] did not observe before he left, (ii) which were not in the damaged condition when you moved in, and (iii) which are theoretically, at least, capable of being repaired:

"[1] The front storm door . . . was in an open position when . . . I arrived. As I suspect you are aware, the mechanism to open and close the door is broken.

"[2] There are two small chunks of the deck behind the family room which have been removed; they look like they were cut out.

"[3] There is water damage in the wall to the side of the shower in the third hall bathroom on the second level. . . .

"Please let me know . . . whether you are going to assume responsibility for repairing these additional items. . . . These items are in addition to the other items that we talked about this morning that are capable of being repaired such as the blinds in the family room . . . missing shelf in middle

hall bathroom, screen door in master bedroom and shower door in the middle hall bathroom . . . . The subject matter of this [e-mail] is confined to the issues identified above—all of which you are capable of repairing if you elect to do so. This [e-mail] is not intended to deal with a variety of other matters which we will address within the next thirty days. Thank you."

[18] The defendant stated in relevant part: "These items, including the items which I am allowing you to repair, include the following:

"[1] The front storm door which I am allowing you to repair within one week of today;

"[2] Two small chunks of the deck behind the family room sliding glass doors which I have arranged to have repaired;

"[3] Water damage to the wall to the side of the shower in the third hall bedroom on the second level of the house which I have arranged to have repaired;

"[4] In the third hall bedroom on the second level of the house, the shower door was completely off the track and I will need to confirm whether or not it was satisfactorily repaired;

"[5] Blinds in the family room (which your brother-in-law took with him to have repaired) and which I am allowing you to repair within one week of today;

"[6] Missing shelf in middle hall bathroom which I have replaced; and

"[7] Screen door in master bedroom which I will have replaced."

[19] The defendant stated: "Pursuant to Paragraph 4 of the Leases, [the plaintiff] was obligated:

"(a) to use the [property] in compliance with all building, housing and fire codes affecting health and safety . . . .

"(b) to keep the [property] clean, neat and safe,

"(c) to remove from the [property] all garbage, trash and other waste in a clean and safe manner. . . .

"(f) to not willfully or negligently destroy, deface, damage, impair or remove any part of the [property] or permit anyone else to do so. . . .

"(i) to keep the [property] in good condition, normal wear and tear excepted, and to pay the first $100 of any cost for each repair. . . . Tenant will pay the cost of any repair required because of Tenant's misuse or neglect."

[20] Paragraph 15 of the second lease provides in relevant part: "[The plaintiff] shall not unreasonably withhold consent to [the defendant] entering [the property]. . . . [The defendant or its] agents may, with [the plaintiff's consent, enter [the property] to . . . make necessary or agreed repairs and alterations . . . ."

[21] At trial, the parties stipulated that the interest on the $8000 security deposit was $46.62, and the attorney trial referee so found in his report.

[22] Neither party to this appeal has argued that the statutory language in question is ambiguous.

[23] Despite his failure to raise a claim of pretext in his complaint, the plaintiff argues that he advanced such a claim in his February 1, 2016 posttrial brief and February 19, 2016 posttrial reply memorandum of law. In those filings, the plaintiff did not separately brief that claim. Rather, he merely asserted that the defendant's claim of damages was " 'fabricated' " and discussed *Carrillo* v. *Goldberg*, supra, 141 Conn. App. 299, stating: "The facts in *Carrillo* are eerily similar to those of the present case in that the landlord was found to have 'fabricated an accounting of damages in order to avoid the sanctions of § 47a-21 (d) (2)' . . . and that [the] 'defendants' claimed damages were pretextual.' "

As this court has observed, "[i]t is well settled that [o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial. . . . [T]he reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court *or the opposing party* to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. . . . After the close of evidence, the defendant raised its [claim] for the first time in a posttrial brief, effectively ambushing the plaintiff. . . . The defendant has provided no authority, nor are we aware of any, indicating that such strategy satisfies the preservation requirement . . . . [T]o permit the appellant first to raise posttrial an issue that arose during the course of the trial would circumvent the policy underlying the requirement of timely preservation of issues. . . . It therefore is not surprising that the trial court did not address the [claim raised for the first time in the posttrial brief] in any manner in its memorandum of decision. To afford review to a claim that the defendant did not raise during trial as

a matter of strategy would contravene the purpose of the preservation requirement." (Citations omitted; emphasis in original; internal quotation marks omitted.) *AS Peleus, LLC* v. *Success, Inc.*, 162 Conn. App. 750, 758–60, 133 A.3d 503 (2016). Perhaps mindful of that precept, the attorney trial referee in the present case did not address the plaintiff's pretext argument in his report. See, e.g., *E & M Custom Homes, LLC* v. *Negron*, 140 Conn. App. 92, 98 n.4, 59 A.3d 262 (2013) ("[t]he court concluded that the defendants had raised this argument for the first time in their posttrial briefs and, therefore, declined to consider it as it would be highly prejudicial to the plaintiff"), appeal dismissed, 314 Conn. 519, 102 A.3d 707 (2014).

[24] In his report, the attorney trial referee found in relevant part: "The defendant did not prove what caused the clothe[s] [dryer] to fail or malfunction or that there was any nexus between [the] plaintiff['s] conduct and said failure or malfunction. . . .

"The defendant did not prove what caused the shower head and/or faucet in the bedroom bath to fail or malfunction or that there was any nexus between [the] plaintiff's conduct and said failure or malfunction. . . .

"The defendant did not prove what caused any of the claimed electrical outlet and/or . . . switch failures or malfunctions, nor did the defendant establish that there was any nexus between [the] plaintiff's conduct and said failure or malfunction. . . .

"The defendant did not prove what caused the shower doors in either bath to fail or malfunction or that there was any nexus between [the] plaintiff's conduct and said failures or malfunctions. . . .

"The defendant failed to prove that the plaintiff was even aware that mud or water accreted in the crawl space. . . .

"The defendant failed to prove that there was any nexus between the plaintiff's conduct and the accretion of mud and/or water in the crawl space. . . .

"The plaintiff did not unreasonably deny the defendant access to the property for the purpose of replacing windows. . . .

"The defendant did not prove that the replacement of the windows on the waterside of the premises, and which the evidence established were old and had been in poor repair for an extended time, were of any immediate necessity. . . .

"The defendant did not prove that the plaintiff failed to pay for a week of occupancy [in May, 2012]. . . .

"The defendant did not prove that the damages caused by the plaintiff [were] even a cause, much less the . . . proximate cause of his inability to rent the property immediately."

[25] The attorney trial referee found in relevant part: "The defendant proved that the plaintiff failed to pay the sum of $506.45 due to the Stamford Water Pollution Control Authority. . . .

"The defendant proved that a shelf was missing from [the second] bathroom in the upper hallway and that he was forced to replace the same at a cost of $110. . . .

"The defendant proved [that] the damages occurred to a screen door in the master bedroom during the plaintiff's possession of the premises and that the defendant expended the sum of $120 to repair the same. . . .

"The defendant proved that blinds, in addition to blinds repaired by the plaintiff, were damaged and/or missing in the master bedroom and living room and that the defendant expended the sum of $550 to replace the same. . . .

"The defendant proved that water damage had occurred to the wall adjacent to the shower in the third bathroom and that the defendant was forced to expend the sum of $220 to rectify the damage. . . .

"As a function of the foregoing damages proven by the defendant, the plaintiff owes the defendant the sum of $1506.45."

[26] In discussing those claims, the attorney trial referee noted that they suffered from "evidentiary deficiencies . . . ." The attorney trial referee found, as but one example, that, although "the defendant credibly established that mud was discovered in the crawl space [on the property], no evidence or testimony was submitted as to how or when this condition was created. . . . Without establishing when the condition was created or that the plaintiff did something to cause this condition to occur, or for that matter was even aware of the condition, this claim [of damages] cannot be credited."